1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

K.M. et al.,

                  Plaintiffs,

      v.

REGENCE BLUESHIELD, et al.,

              Defendants.

CASE NO. C13-1214 RAJ

AMENDED* ORDER

## I. INTRODUCTION

This matter comes before the court on plaintiffs' motion for preliminary injunction and motion for class certification.[1]  Dkt. ## 17, 20.  Defendants Regence BlueShield and Cambria Health Solutions, Inc., f/k/a The Regence Group oppose the motions.  Dkt. ## 23, 26.

As a preliminary matter, defendants move to strike new evidence and argument submitted for the first time with plaintiffs' reply.  Dkt. # 32.  With respect to argument,

---

    * The court has amended section III.E.2 of this order addressing commonality as discussed in the court's order denying defendant's motion for reconsideration.  Dkt. # 61.  This amended order replaces the court's January 24, 2014 order at Dkt. # 51.

    [1] Although the motion for preliminary injunction is styled as "plaintiffs' motion," it appears that only B.S. and Disability Rights Washington ("DRW") seek class-wide preliminary injunctive relief (and not K.M.).  *See* Dkt. # 17 at 11-15.

1   plaintiffs' arguments in reply respond directly to defendants' arguments in opposition,

2   and are therefore appropriate.  With respect to evidence, plaintiffs argue that the evidence

3   is consistent with plaintiffs' arguments in their opening brief and responsive to

4   defendants' brief.  Dkt. # 46 at 2 (citing *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032,

5   1040 (9th Cir. 2003)).  Courts in this District have denied motions to strike evidence

6   submitted with a parties' reply when it is evidence submitted in response to arguments

7   raised in a party's opposition.  *See e.g., Reming v. Holland Am. Line Inc.*, Case No. C11-

8   1609RSL, 2013 WL 5963119, *3 (W.D. Wash. Nov. 7, 2013); *Lexington Ins. Co. v.

9   Swanson*, Case No. C05-1614MJP, 2007 WL 1585099, *5 (W.D. Wash. May 23, 2007).

10  The evidence submitted in reply responds to defendants' arguments and evidence in

11  opposition.  Accordingly, it is properly before the court.  Nevertheless, plaintiffs indicate

12  that since the motions before the court are preliminary and non-dispositive, plaintiffs do

13  not object to a decision by the court to not rely upon the additional evidence submitted to

14  ensure an expedited decision.  Dkt. # 46 at 1.  Because the evidence submitted by

15  plaintiffs in reply is superfluous and plaintiffs do not object to a decision by the court to

16  not rely upon the evidence, the court has not considered the evidence submitted in reply.[2]

17      Having considered the memoranda, evidence, oral argument, and the record

18  herein, the court GRANTS plaintiffs' motions.

19                          **II. BACKGROUND**

20      Plaintiffs B.S. and K.M. filed suit on July 11, 2013,[3] alleging that Defendants have

21  failed to comply with Washington's Mental Health Parity Act ("Parity Act") and the Paul

22  Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008

23

24      [2] Accordingly, the court has not considered the September 20, 2013, declarations of
    Eleanor Hamburger and Mark Stroh.  Dkt. ## 30-31.

25      [3] In related case *J.T. v. Regence BlueShield*, Case No. C12-90 RAJ, this court denied

26  plaintiffs' request to substitute B.S. as a named plaintiff in that case.  Case No. C12-90RAJ Dkt.
    # 85 at 2.  The court recognized that the practical implication may result in B.S. filing a separate

27  complaint.  *Id.* at 2-3.  B.S. has now done so here.

("Federal Parity Act").[4]  Dkt. # 1 at ¶¶ 10-14.[5]  B.S., K.M., and DRW contend that the health care plans underwritten by Defendants do not provide coverage for K.M and B.S.'s medically necessary neurodevelopmental therapy, thus violating the mandates of the Parity Act and the Federal Parity Act.  Dkt. # 13 (FAC) ¶¶ 11–18.

The Employee Retirement Income Security Act ("ERISA") governs the health care plans at issue, and thus plaintiffs bring their claims under its provisions.  *See* 29 U.S.C. § 1002(1).  Plaintiffs' amended complaint sets forth three claims for relief: (1) breach of fiduciary duties pursuant to ERISA § 404(A)(1), 29 U.S.C. § 1104(A); (2) recovery of benefits, clarification of rights under terms of the plan, and clarification of rights to future benefits under the plan pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); and (3) to enjoin acts and practices in violation of the terms of the plans, to obtain other equitable relief, and to enforce the terms of the plans pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  Dkt. # 13 (FAC) ¶¶ 36–49.

B.S. is a nine year-old[6] who is enrolled in a Regence-insured health plan through his father's employment.  Dkt. # 6 (E.S. Decl.) ¶ 2, Ex. A.  Several medical professionals confirmed B.S.'s diagnosis of autism, a condition listed in the Diagnostic and Statistical Manual ("DSM") published by the American Psychiatric Association that qualifies as a "mental health condition," and recommended speech and language therapy for treatment.  Dkt. # 6-2 at 5-7 (Ex. B to E.S. Decl., April 17, 2012, Araujo Eval.); # 6-4 at 2-4 (Ex. D to E.S. Decl., July 25, 2012, Long Eval.); # 6-5 at 2 (Ex. E to E.S. Decl., Aug. 7, 2012,

---

[4] Plaintiffs' motions do not seek relief based on the Federal Parity Act.

[5] DRW was not named as a plaintiff in the original complaint, but was added to the amended complaint ("FAC") filed July 18, 2013.  *See* Dkt. ## 1, 13.  DRW is the state-designated protection and advocacy organization pursuant to the Federal Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15041, *et seq.*, the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, *et seq.*, and RCW 71A.10.080.  Dkt. # 19 (Stroh Decl.) ¶ 3.

[6] B.S. was born in 2004, and as of July 11, 2013, was eight years old.  Dkt. # 6 (E.S. Decl.) ¶ 2; # 6-2 at 2 (Ex. B to E.S. Decl.).  During oral argument, the parties confirmed that B.S. is currently nine years old.

Wagner Letter); *see also* Dkt. # 6-3 at 2-3 (Ex. C to E.S. Decl., Oct. 22, 2012, Gray Eval.).  B.S.'s parents submitted claims to Regence for coverage of his speech and occupational therapies, but Regence denied coverage because B.S. was "over the age of six and did not meet the age limit set by [his] contract for this benefit."  Dkt. # 6-6 at 3 (Ex. F to E.S. Decl.).

B.S.'s plan contains the following relevant provisions:

We cover Mental Health Services for treatment of Mental Health Conditions.

\* \* \*

Mental Health Conditions means Mental Disorders in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association except as otherwise excluded under this Contract.  Mental Disorders that accompany an excluded diagnosis are covered.

Mental Health Services means Medically Necessary outpatient services, Residential Care, partial hospital program or inpatient services provided by a licensed facility or licensed individuals with the exception of Skilled Nursing Facility services (unless the services are provided by a licensed behavioral health provider for a covered diagnosis), home health services and court ordered treatment (unless the treatment is determined by Us to be Medically Necessary).

\* \* \*

We cover inpatient and outpatient neurodevelopmental therapy services. To be covered, such services must be to restore and improve function for a Member age six and under with a neurodevelopmental delay.  For the purposes of this provision, neurodevelopmental delay means a delay in normal developmental that is not related to any documented Illness or Injury.  Covered Services include only physical therapy, occupational therapy and speech therapy and maintenance services, if significant deterioration of the Member's condition would result without the service.

\* \* \*

Medically Necessary or Medical Necessity means health care services or supplies that a Physician or other health care Provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an Illness, Injury, disease or its symptoms, and that are:

- in accordance with generally accepted standards of medical practice;
- clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's Illness, Injury or disease; and
- not primarily for the convenience of the patient, Physician or other health care Provider, and not more costly than an alternative service or sequence of services or supply at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's Illness, Injury or disease.

Dkt. # 6-1 at 18-19, 67 (Ex. A to E.S. Decl., Policy at 11-12, 60).

B.S. and DRW seek a preliminary injunction prohibiting defendants from denying coverage for neurodevelopmental therapy to treat mental health conditions based on the age exclusion in defendants' plans. B.S. and DRW also seek class certification for a prospective neurodevelopmental subclass related to Regence's age exclusion for neurodevelopmental therapy to treat mental health conditions.

### III. ANALYSIS

**A. Parity Act**

"Prior to 2005, no Washington state law mandated that insurance providers include coverage for mental health services in their health benefit plans." *J.T. v. Regence BlueShield*, 291 F.R.D. 601, 606 (W.D. Wash. 2013) (citing S.B. Rep., S.H.B. 1154 (Wash. 2005)). "The legislature addressed this lack of coverage in the Parity Act, finding that 'the costs of leaving mental disorders untreated or undertreated are significant,' and that 'it is not cost-effective to treat persons with mental disorders differently than persons with medical and surgical disorders.'" *Id.* (quoting S.H.B. 1154, 59th Leg., 2005 Reg. Sess. (Wash. 2005)); Dkt. # 9-4 at 3-4. "The Parity Act's objective was to achieve coverage for mental health services 'under the same terms and conditions as medical and surgical services.'" *Id.* The Parity Act defines "mental health services" as "medically necessary outpatient and inpatient services provided to treat mental disorders covered by the diagnostic categories listed in the most current version of the diagnostic and statistical

1  manual of mental disorders." RCW 48.44.341(1). The Act sets forth a five-year, three-

2  phase implementation process. *See* RCW 48.44.341(2)(a)–(c).

3       The first phase of the Act, applicable to health benefit plans "delivered, issued for

4  delivery, or renewed on or after January 1, 2006," required that "[a]ll health service

5  contracts providing health benefit plans that provide coverage for medical and surgical

6  services shall provide . . . [m]ental health services." RCW 48.44.341(2)(a)(i).

7  Additionally, the copayment for such services could be no greater than the copayment for

8  medical or surgical services, and the plans were required to cover prescription drugs to

9  treat mental health disorders to the same extent and under the same terms and conditions

10  as other covered prescription drugs. RCW 48.44.341(2)(a)(i)–(ii).

11       Phase two, applicable to health plans delivered, issued, or renewed on or after

12  January 1, 2008, incorporated the mandates of phase one and added the requirement that

13  any health benefit plan that imposed a maximum out-of-pocket limit or stop loss must

14  impose a single limit or stop loss for medical, surgical, and mental health services. RCW

15  48.44.341(2)(b)(i).

16       The final phase, applicable to plans delivered, issued, or renewed on or after July

17  1, 2010, incorporates the mandates of the previous two phases and adds the condition that

18  any deductible requirement include mental health, medical, and surgical services.

19  Additionally, this phase adds the provision that "[t]reatment limitations or any other

20  financial requirements on coverage for mental health services are only allowed if the

21  same limitations or requirements are imposed on coverage for medical and surgical

22  services." RCW 48.44.341(2)(c)(i).

23

24

25

26

27

**B.   Article III Standing**[7]

Just like any other plaintiff, a plaintiff bringing an ERISA claim must have standing pursuant to Article III of the United States Constitution. *Paulsen et al. v. CNF, Inc., et al.*, 559 F.3d 1061, 1072 (9th Cir. 2009). To have standing under Article III, a plaintiff must demonstrate that (1) he has suffered an actual or threatened injury in fact; (2) the injury is causally connected to the conduct complained of; and (3) it is likely, and not merely speculative, that his injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The requisite injury-in-fact pursuant to Article III must be actual or threatened, and not merely speculative. *See id.*

1.   B.S.

First, B.S. suffered the requisite injury in fact. On September 24, 2012, Regence denied coverage of the occupational and speech therapy to treat his autism pursuant to the neurodevelopmental therapy age exclusion. Dkt. # 6-6 at 3 (Ex. F to E.S. Decl.). The medical professional evaluations before Regence indicated that the recommended neurodevelopmental therapies were to treat his autism. *See* Dkt. # 6-2 at 5-7 (Ex. B to E.S. Decl., April 17, 2012, Araujo Eval.) (confirming diagnosis of autistic spectrum and identifying speech and language therapy for treatment); # 6-4 at 2-4 (Ex. D to E.S. Decl., July 25, 2012, Long Eval.) (identifying autism spectrum as diagnosis and speech and language therapy for treatment); # 6-5 at 2 (Ex. E to E.S. Decl., Aug. 7, 2012, Wagner Letter) (identifying autism spectrum disorder and noting that B.S. is planned for speech therapy); *see also* Dkt. # 6-3 at 2-3 (Ex. C to E.S. Decl., Oct. 22, 2012, Gray Eval.) (noting reason for referral as autism spectrum diagnosis, and referring reader to prior evaluations recommending speech and occupational therapy).[8] Accordingly, the court

---

[7] In opposition to both motions, defendants argue that both B.S. and DRW lack Article III standing. Accordingly, the court addresses whether B.S. and DRW have constitutional standing first. The court has addressed whether DRW has statutory standing under ERISA below.

[8] The court notes that Dr. Gray's evaluation came after Regence's denial. The court also notes that nothing in Dr. Gray's evaluation indicates that she believed the prior recommendations

1   finds that B.S. suffered an actual and particularized injury when Regence denied

2   coverage due to its neurodevelopmental therapy age exclusion.  Additionally, given

3   Regence's continued and sustained position across several cases in denying

4   neurodevelopmental therapy to children age seven and older based on the age exclusion,

5   the court finds that it is likely that the injury will be ongoing without court intervention.

6          Second, B.S.'s denial of coverage for neurodevelopmental therapy to treat autism

7   is causally connected to Regence's standard practice to exclude such coverage based on

8   an insured's age.  *See* Dkt. # 6-6 at 2-3 (Ex. F to E.S. Decl., Sept. 24, 2012, denial letter)

9   (identifying code 299.00[9] (infantile autism), and identifying age exclusion as reason for

10   denial).

11          Finally, B.S.'s injury will be redressed by injunctive relief because Regence would

12   be prohibited from applying its age exclusion to B.S.'s neurodevelopmental therapies.

13   Defendants have argued that the neurodevelopmental therapies are not "medically

14   necessary."[10]  Dkt. # 26 at 19-20.[11]  The court believes that the same evidence cited above

15   supports a finding that the neurodevelopmental therapies are likely medically necessary

16   for B.S.

17

18   for speech therapy were inappropriate or should not continue.  Rather, she referred the reader to
     the prior three assessments for a comprehensive review of their findings.

19          [9] The DSM-IV code for autistic disorder is 299.00.

20          [10] Defendants submitted supplemental authority from the Northern District of California
     that found that class action was inappropriate where the court would have to make individual

21   determinations as to medical necessity.  Dkt. # 49 at 4-6 (*Dennis F. v. Aetna Life Ins.*, Case No.
     C12-2819SC, 2013 U.S. Dist. LEXIS 137849 (N.D. Cal. Sept. 25, 2013).  That case did not

22   address Article III standing.  Additionally, defendants did not deny B.S.'s claim based on
     medical necessity here.  Rather, defendants denied B.S.'s claim based solely on the age exclusion

23   in the contract.  Accordingly, that case is distinguishable from this action.

24          [11] Defendants have not cited to any evidence in this portion of their argument.
     Nevertheless, in December 2012, Dr. Lori Montaperto, the school psychologist, evaluated B.S.

25   for special education services.  Dkt. # 27-2 at 2 (Ex. 6 to Little Decl.).  Such evaluations are for
     the purpose of determining the educational needs of students in the school district.  *See* WAC

26   ADC 392-172A-03020.  This evaluation for educational needs in school does not negate the
     prior conclusions of various medical professionals that language and speech therapy was

27   indicated to treat B.S.'s autism.

1    Accordingly, the court finds that B.S. has standing to pursue injunctive relief.

2        2.   DRW

3        Plaintiff argues that DRW has constitutional standing under the doctrine of

4    associational standing.  Dkt. # 29 at 4-9.

5        "The doctrine of associational standing permits an organization to sue to redress

6    its members' injuries, even without a showing of injury to the association itself."  *Or.*

7    *Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003) (internal quotations omitted).

8    An association has standing to bring suit on behalf of its members when "(a) its members

9    would otherwise have standing to sue in their own right; (b) the interests it seeks to

10   protect are germane to the organization's purpose; and (c) neither the claim asserted nor

11   the relief requested requires the participation of individual members in the lawsuit.  *Hunt*

12   *v. Wash. State Apple Adver. Com'n*, 432 U.S. 333, 343 (1977).  The first two

13   requirements are constitutional in nature, the third is prudential.  *Or. Advocacy*, 322 F.3d

14   at 1109.  To satisfy the first prong of *Hunt*, at least one constituent of the organization

15   must have standing to sue in his/her own right.  *Id.* at 1112.

16       In enacting the Protection and Advocacy for Mentally Ill Individuals Act of 1986

17   ("PAMII"), Congress recognized that individuals with mental illness are vulnerable to

18   abuse and serious injury, that family members of individuals with mental illness often

19   play a crucial role in advocating for rights of individuals with mental illness, that

20   individuals with mental illness are subject to neglect, including lack of treatment and

21   health care, among others, and that State systems for monitoring compliance with respect

22   to the rights of individuals with mental illness vary widely and are frequently inadequate.

23   42 U.S.C. § 10801(a).  PAMII was enacted to ensure that the rights of individuals with

24   mental illness are protected and to assist States to establish and operate a protection and

25   advocacy system for individuals with mental illness that will "protect and advocate the

26   rights of such individuals through activities to ensure the enforcement of the Constitution

27   and Federal and State statutes" and to investigate incidents of abuse and neglect of such

AMENDED ORDER - 9

1  individuals. *Id.* § 10801(b). "Under PAMII, protection and advocacy systems such as

2  [DRW] are authorized to 'pursue . . . legal, and other appropriate remedies to ensure the

3  protection of individuals with mental illness who are receiving care or treatment in the

4  State.'" *Or. Advocacy*, 322 F.3d at 1110 (quoting 42 U.S.C. § 10805(a)(1)(B)).

5       DRW protects and advocates for the legal and civil rights of those who have

6  physical, mental and developmental disabilities. Dkt. # 19 (Stroh Decl.) ¶ 3. A majority

7  of DRW's Board of Directors are self-identified as individuals with disabilities including

8  mental health conditions. *Id.* ¶ 5. DRW also has an advisory council composed

9  predominantly of individuals who self-identify as having mental health conditions. *Id.*

10  Additionally, "individuals who self-identify as having developmental mental conditions

11  and their family members participate in and guide DRW's organizational mission and

12  advocacy efforts through DRW's Disability Advisory Council, by participating on

13  DRW's Board of Directors, and DRW's public comment process." *Id.* DRW has worked

14  to ensure that individuals with mental health conditions receive access to mental health

15  coverage, both in private insurance and public benefits. *Id.* ¶ 6. "For this reason, DRW

16  supported the Mental Health Parity Act and was a participant in the Mental Health Parity

17  Coalition." *Id.* "All of the unnamed class members are DRW's constituents. By

18  definition, all are diagnosed with mental health conditions and need access to non-

19  discriminatory health coverage. All fall within DRW's mandate to ensure that the rights

20  of persons with mental health conditions are protected."[12] *Id.* ¶8.

21       Accordingly, the court finds that B.S. is a constituent of DRW, and that DRW's

22  constituents, including individuals with mental health conditions, possess enough indicia

23  of membership to satisfy the purposes of associational standing. *See Or. Advocacy*, 322

24  F.3d at 1111 (constituents possessed enough indicia of membership to satisfy purposes of

25

26      [12] The court notes that defendants did not object to, or move to strike, any portion of Mr.
Stroh's declaration submitted with plaintiffs' opening brief. While defendants note that Mr.

27  Stroh's second declaration submitted in reply may conflict with this declaration and object to the
second declaration, the court has not considered the second declaration. Dkt. # 32 at 2 (Surreply).

1   associational standing:  "that the organization is sufficiently identified with and subject to

2   the influence of those it seeks to represent as to have a 'personal stake in the outcome of

3   the controversy.'").

4          Defendants incorrectly argue that a protection and advocacy organization has

5   limited authority to pursue legal remedies for an individual who is an individual with a

6   mental illness, but only with respect to matters which occur within 90 days after the date

7   of the discharge from a facility.  Dkt. # 26 at 21 (citing 42 U.S.C. § 10805(a)(1)(C)).

8   Subsection (C) only applies to an individual who "was" an individual with mental illness,

9   whereas subsection (B) applies to individuals "with mental illness who are receiving care

10  or treatment in the State."  Since B.S. is an individual who currently has autism, he falls

11  within subsection (B).  Defendants do not otherwise challenge the first *Hunt* factor on

12  any other grounds with respect to PAMII.[13]  Dkt. # 26 at 21.  Accordingly, the court finds

13  that the first *Hunt* factor is met. *See Or. Advocacy*, 322 F.3d at 1110 ("Given OAC's

14  statutory mission and focus under PAMII, its constituents—in this case, the mentally

15  incapacitated defendants—are the functional equivalent of members for purposes of

16  associational standing."); 42 U.S.C. §§ 10805(a)(1)(B), 10802(4)(A) & (B)(ii); Dkt. # 19

17  (Stroh Decl.) ¶¶ 3-5, 8-9.

18         Defendants also argue that ERISA benefits litigation is not "germane" to the

19  protection and advocacy purpose under PAMII of abuse, injury and neglect under the

20  second prong of *Hunt*.  Dkt. # 26 at 21.  Defendants inaccurately frame the scope of

21  PAMII and the scope of this litigation.  As indicated above, PAMII was enacted to ensure

22  that the rights of individuals with mental illness are protected and to assist States to

23  establish and operate a protection and advocacy system for individuals with mental

24  _____

25         [13] The court notes that PAMII expressly defines the term "individual with mental illness"
    to include a person who has a significant mental illness or emotional impairment and who "lives
26  in a community setting, including their home."  42 U.S.C. § 10802(4)(B)(ii).  Accordingly, the
    express language of the statute demonstrates that the individual need not be receiving treatment
27  in a facility, as defendant argues.

1  illness that will "protect and advocate the rights of such individuals through activities to

2  ensure the enforcement of the Constitution and Federal and State statutes" and to

3  investigate incidents of abuse and neglect of such individuals.  42 U.S.C. § 10801(b).  In

4  this litigation, DRW seeks to pursue legal remedies of individuals with mental health

5  conditions by enforcing parity rights of Regence's insureds.  DRW's purpose is to protect

6  and advocate for the legal and civil rights of those citizens of this State who have mental

7  and developmental disabilities.  Dkt. # 19 (Stroh Decl.) ¶ 3; *see also id.* ¶ 6.

8  Accordingly, the court finds that the second *Hunt* prong is met with respect to PAMII.

9      Since the court has found that DRW has met the first two prongs in *Hunt* with

10  respect to PAMII, and defendants do not challenge the third, the court finds that DRW

11  has constitutional standing to represent its constituents—individuals with physical,

12  mental and developmental disabilities in Washington State.[14]

13  **C.   Preliminary Injunction**

14      "A plaintiff seeking a preliminary injunction must establish that he is likely to

15  succeed on the merits, that he is likely to suffer irreparable harm in the absence of

16  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

17  the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct.

18  365, 374 (2008).  An injunction will not issue if the moving party merely shows a

19  possibility of some remote future injury or a conjectural or hypothetical injury.  *Park*

20  *Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th

21  Cir. 2011).  Additionally, mandatory injunctions are particularly disfavored, and are not

22  granted unless extreme or very serious damage will result, and are not issued in doubtful

23  cases.  *Id.*

24

25      [14] Given that the court has found that DRW has associational standing, the court need not
    separately address defendants' argument that DRW fails to establish standing based on injury to

26  itself. Dkt. # 26 at 23; *see Or. Advocacy*, 322 F.3d at 1109 (associational standing allows
    organization to sue to redress its members' injuries without a showing of injury to the association

27  itself).

1        1.   Likelihood of Success on the Merits

2            Plaintiffs argue that they are likely to succeed on the merits because (1) the Parity

3    Act establishes a baseline coverage mandate, such that Regence cannot exclude medically

4    necessary outpatient services to treat mental health conditions listed in the DSM; (2)

5    Regence's plan must incorporate the express requirement of the Parity Act, and so its

6    blanket exclusion of neurodevelopmental therapy coverage for persons age seven and

7    older violates state law; and (3) Regence is collaterally estopped from relitigating this

8    same issue.  Dkt. # 17 at 17.

9            Defendants argue that plaintiffs are not likely to succeed on the merits because (1)

10   Regence's neurodevelopmental therapy benefit in B.S.'s plan complies with the Parity

11   Act because it applies the "age limit" equally for DSM and non-DSM conditions; (2) the

12   recent Washington State Office of Insurance Commissioner's ("WOIC") regulations do

13   not apply to B.S.'s plans; and (3) offensive non-mutual collateral estoppel is not

14   applicable.[15]  Dkt. # 26 at 6-14.

15               *a.  Age-Based Restriction*

16           Defendants repeatedly refer to the age-based restriction in the plan as an "age

17   limit."  Dkt. # 26 at 8, 10, 11.  However, in *J.T.*, this court squarely addressed whether

18   the age-based restriction on coverage should be construed as a treatment limitation or an

19   exclusion.  *J.T. v. Regence BlueShield*, 291 F.R.D. 601, 608 (W.D. Wash. 2013).  The

20   court interpreted the relevant provision of the statute: "[t]reatment limitations or any

21   other financial requirements on coverage for mental health services are only allowed if

22   the same limitations or requirements are imposed on coverage for medical and surgical

23   services[.]"  *Id.*; RCW 48.44.341(2)(c)(i).  The court found that reading "RCW 48.44.341

24   as a whole indicates that although the coverage mandate originated in phase one, it was

25

26   _____
     [15] The court has also addressed defendants' argument regarding whether DRW lacks
27   statutory standing under ERISA under this prong because if DRW lacks statutory standing, it is
     not likely to succeed.

AMENDED ORDER - 13

1  permissible to impose certain financial limits or requirements on that coverage until full

2  parity was achieved in phase three.  What was not permissible in phase one was to

3  completely exclude coverage for an entire class of beneficiaries." *Id.*

4         That reasoning applies equally here to B.S.  As in *J.T.*, defendants seek to exclude

5  coverage for children age seven and older seeking neurodevelopmental therapy, rather

6  than seek a treatment limitation or other financial requirement on coverage, such as visit

7  limits or annual monetary caps.  The cases cited by defendants rely on the "treatment

8  limitations" clause in finding that visit limitations and annual monetary caps do not

9  violate the Parity Act.  *See Z.D. v. Group Health Coop.*, Case No. C11-1119RSL, 2013

10  WL 1412388, *1-3; *O.S.T. v. Regence BlueShield*, Case No.11-2-34187-9 SEA, Dkt. #

11  27-3 at 3-6 (Ex. 8 to Little Decl., April 17, 2012 order); *J.T*, 291 F.R.D. at 614.  Indeed,

12  the court is not aware of any case that has held that the age-based restriction is a

13  treatment limitation.  Although defendant contended during oral argument that it was not

14  arguing that the age restriction was a treatment limitation, all of the cases it relied on

15  analyzed the "treatment limitations" clause.

16         The court finds that plaintiffs are likely to succeed on the merits that that the age-

17  based restriction is an exclusion of coverage, not a treatment limitation, and therefore

18  likely invalid.[16]  *See* Dkt. # 9-1 at 5, 6, 8, 11, 14 (Ex. A to 1st Hamburger Decl., Rainey

19  Depo. at 14:18-22, 18:6-11, 27:11-20, 37:21-38:1, 49:18-50:10) (testifying that group

20

21

---

22     [16] Accordingly, the court need not address defendants' second and third arguments that

23  WOIC's regulations do not apply to B.S.'s plan or that collateral estoppel is inapplicable.  The court notes that it appears that collateral estoppel would be appropriate if plaintiffs provided the

24  court with the plan language, 30(b)(6) testimony, briefing and other relevant documents in the *O.S.T.* case to support its argument that Regence already litigated the issue of its standard

25  practice to exclude neurodevelopmental therapy for children ages seven and older.  During oral argument, plaintiff referenced the arguments and issues presented to Judge Erlick, but that record

26  is not before the court.  Defendants' argument that *O.S.T.* only applied to non-ERISA group plans appears to be a distinction without a difference where defendants interpreted similar policy

27  language the same way and it appears that the same issues were litigated by the same parties.

1  plans exclude coverage for neurodevelopmental therapies after an insured reaches the age

2  of seven).

3          *b. ERISA Standing*

4          Defendants also argue that DRW does not have statutory standing under ERISA.[17]

5  Dkt. # 26 at 23-24.

6          An ERISA civil action may be brought by a participant, beneficiary, fiduciary, or

7  the Secretary of Labor.  29 U.S.C. § 1132(a).

8          Defendants appear to conflate constitutional standing and statutory standing under

9  ERISA in arguing that no court has held that a protection and advocacy system may

10  purport to act as a participant, beneficiary or fiduciary in pursuing ERISA benefits claims

11  on behalf of its constituents.  Dkt. # 26 at 23.  Plaintiffs do not contend that ERISA

12  claims have been assigned.  Rather, they argue that DRW is both the "plan sponsor" and

13  "plan administrator" under its plan with Regence, and therefore a fiduciary.  Dkt. # 29 at

14  8-9.

15          "ERISA defines a fiduciary as any person 'to the extent … he has any

16  discretionary authority or discretionary responsibility in the administration of [an

17  employee benefit] plan.'"  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 220 (2004)

18  (quoting § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii)).  "[A] plan administrator engages

19  in a fiduciary act when making a discretionary determination about whether a claimant is

20  entitled to benefits under the terms of the plan documents."  *Varsity Corp. v. Howe*, 516

21  U.S. 489, 511 (1996); *see also* 29 C.F.R. § 2509.75-8, D-3 ("[A] plan administrator or a

22  trustee of a plan must, [by] the very nature of his position, have 'discretionary authority

23  or discretionary responsibility in the administration' of the plan within the meaning of

24  section 3(21)(A)(iii) of the Act.  Persons who hold such positions will therefore be

25  fiduciaries.").

26  _____

27          [17] The court notes that defendants do not challenge B.S's standing under ERISA.

AMENDED ORDER - 15

1   The documents plaintiffs identify to support their argument that DRW has ERISA

2   standing are the amended complaint and Stroh declaration. Dkt. # 29 at 8 (citing Dkt. #

3   13 (FAC) ¶ 6 & Dkt. # 19 ¶ 7). In the amended complaint, plaintiffs allege that "DRW is

4   also an ERISA plan sponsor and an ERISA plan administrator under a plan insured by

5   Regence." Dkt. # 13 (FAC) ¶ 6. In his declaration, Mr. Stroh represents that DRW

6   purchases health insurance for its employees through Regence and that under the

7   Regence contract, DRW is both the "plan sponsor" and "plan administrator." Dkt. # 19

8   (Stroh Decl.) ¶ 7. However, "an employer's fiduciary duties under ERISA are implicated

9   only when it acts in the latter capacity." *Beck v. PACE Intern. Union*, 551 U.S. 96, 103

10   (2007).

11   During oral argument, defendant conceded that DRW was a plan administrator and

12   that there was no need to parse out whether it was acting in its role as a plan sponsor or

13   plan administrator.[18] As a plan administrator, DRW is a fiduciary of the Regence plan,

14   and therefore has standing under ERISA. 29 C.F.R. § 2509.75-8, D-3.

15      2.   Irreparable Harm

16   Defendants argue that B.S. will not suffer immediate irreparable harm because

17   speech or occupational therapy is not currently medically necessary for B.S. Dkt. # 26 at

18   15. However, the court has already found that the evidence before the court supports a

19   finding that the neurodevelopmental therapies are likely medically necessary.

20   Additionally, the Ninth Circuit has recognized that reduction or elimination of

21   health benefits irreparably harms the participants in the programs being cut. *See e.g.*,

22   *M.R. v. Dreyfus*, 697 F.3d 706, 733 (9th Cir. 2012) (loss of medically necessary services

23   under Washington law related to mental and physical health demonstrates likelihood of

24   

25      [18] Although defendant reiterated during oral argument that there is no case that allows a
protection and advocacy system to act as a fiduciary in pursuing ERISA benefits claims on

26   behalf of its constituents, there is also no case that prohibits it. Whether an entity has
associational standing for purposes of Article III is a separate and distinct analysis from whether

27   an entity has standing under ERISA.

AMENDED ORDER - 16

1   irreparable injury); *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm

2   includes delayed and/or complete lack of necessary treatment, and increased pain and

3   medical complications); *Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982) (denial of

4   needed medical care creates risk of irreparable injury).

5           Defendants do not contest this legal authority.  Rather, they argue that the harm is

6   not imminent or immediate.  Dkt. # 26 at 17.  Defendants argue that plaintiffs waited

7   more than eight months, from the September 27, 2012, denial of appeal, until June 6,

8   2013, before pursuing any relief on B.S.'s behalf.  *Id.*  The court disagrees.  B.S.

9   contacted plaintiffs' counsel in January 2013.  In the *J.T.* case, plaintiffs first raised B.S.

10  as a putative class member on January 10, 2013, suggesting that the court could substitute

11  him for S.A. if the court had concerns about whether S.A. was an adequate

12  representative.  Case No. C12-90RAJ, Dkt. # 28 at 10 n.3.  The court did not rule on the

13  pending motions until June 4, 2013, in which the court denied plaintiffs' suggestion to

14  substitute B.S.  Case No. C12-90RAJ, Dkt. # 67.  Two days later, plaintiffs file a motion

15  to amend the complaint to add B.S. as a plaintiff, which the court denied on July 1, 2013.

16  Dkt. ## 68, 85.  Plaintiffs filed this case on July 11, 2013, and filed the motion for

17  preliminary injunction on the same day.  Dkt. ## 1, 4.  Accordingly, the court finds that

18  plaintiffs did not unduly delay seeking a preliminary injunction.

19          In the last two decades, research and program development in the area of

20  educational intervention have focused largely on very young children with Autistic

21  Spectrum Disorder "because of earlier identification and evidence that early intensive

22  intervention may result in substantially better outcomes."  Dkt. # 9-5 at 6 (Ex. L to

23  Hamburger Decl., Scott Myers, MD, Chris Johnson, MD, MEd, & Council on Children

24  with Disabilities, *Mgmt. of Children with Autism Spectrum Disorders*, Am. Academy of

25  Pediatrics, Clinical Report).  Additionally, children who need neurodevelopmental

26  therapies, but do not receive them in a timely manner and at the required intensity "are

27  likely to lose the opportunity to have the impact of their developmental deficits reduced

1    to the maximum degree, or to enjoy the prospects of their development being restored to

2    normal functioning, or at the very least, as near to normal functioning as possible."  Dkt.

3    # 7 (Glass Decl.) ¶ 8.  "Especially for the very young child, losing access to needed

4    therapies in a timely manner can make reversible or treatable developmental conditions

5    more severe, of greater long-term functional impact and, at times, devastating and

6    unneeded consequences may be seen."  *Id.*  Accordingly, it appears from the evidence

7    before the court that B.S., at age 9, has a greater urgency for the recommended treatment

8    given that the efficacy of treatment reduces with age.

9         For the reasons stated above, the court finds that B.S. has demonstrated the

10   likelihood that defendants wrongfully denied him medical coverage for medically

11   necessary neurodevelopmental therapies to treat his autism, and that such denial will

12   likely cause immediate, irreparable harm to B.S. *See M.R.*, 697 F.3d at 733; *Rodde*, 357

13   F.3d at 999; *Beltran*, 677 F.2d at 1322; *see also* Dkt. # 9-4 at 3 (Ex. I to Hamburger

14   Decl., Substitute House Bill 1154) ("The legislature finds that the costs of leaving mental

15   disorders untreated or undertreated are significant, and often include: Decreased job

16   productivity, loss of employment, increased disability costs, deteriorating school

17   performance, increased use of other health services, treatment delays leading to more

18   costly treatments, suicide, family breakdown, and impoverishment, and

19   institutionalization, whether in hospitals, juvenile detention, jails, or prisons.").

20        3.   Balance of Equities and Public Interest

21        With respect to balancing the equities, defendants argue that plaintiffs rely on

22   speculative harm for unnamed persons, that the available research shows that the

23   effectiveness of these therapies for developmental delays diminishes with age and is most

24   cost effective in the very young, and that less than 7% of individuals age 7 and over with

25   neurodevelopmental disorders related to a DSM condition had any functional limitation

26   at school, work or home.  Dkt. # 26 at 18.

27

1      As discussed above, B.S. has demonstrated the likelihood that defendants

2 wrongfully denied coverage of medically necessary neurodevelopmental therapies to treat

3 his autism in violation of the Parity Act.  B.S. has also demonstrated the likelihood of

4 irreparable harm.  Such therapies are most effective in young children, and losing access

5 to needed therapies in a timely manner can make reversible or treatable developmental

6 conditions more severe, of greater long-term functional impact and, at times, devastating

7 and unneeded consequences may be seen.  While the effectiveness of these therapies

8 appears to diminish with age, there is no evidence before the court that B.S. or other

9 putative class members will not benefit from such therapies.  Rather, the evidence before

10 the court indicates that B.S. will benefit from such therapy.  Additionally, even if the

11 statistic provided by defendants is accurate and relevant to this analysis, there would still

12 be seven percent of individuals over the age of 7 who would benefit from such

13 therapies.[19] When faced with a conflict between financial concerns and an individual's

14 health, the balance of the hardships tips in plaintiffs' favor.  *See Rodde*, 357 F.3d at 999

15 (concluding that when faced with a conflict between financial concerns and preventable

16 human suffering, court had little difficulty concluding that the balance of the hardships

17 tips decidedly in plaintiffs' favor).  Accordingly, the court finds that the balance of the

18 hardships favors plaintiffs, particularly where it appears that the benefit of therapies

19 reduces as the child gets older.

20      The court also finds that the public interest will be served by ensuring that

21 defendants comply with the Parity Act and provide neurodevelopmental therapy benefits

22 to children older than six to treat mental health conditions.

23      Accordingly, the court finds that a preliminary injunction should issue.

24

25

26

27    [19] The children over the age of 7 would seem to have a greater urgency for therapy where the efficacy and benefits of therapy decline as the child gets older.

**E.   Class Certification**[20]

Plaintiffs seek to certify the prospective neurodevelopmental subclass defined as follows:

All individuals who:

(1) are, or will be, beneficiaries under an ERISA-governed health plan that has been or will delivered, issued for delivery, or renewed on or after January 1, 2006, by Regence; and (2) require neurodevelopmental therapy for the treatment of a qualified mental health condition.

**Definitions:**

(1) The term "Regence" shall mean (a) Regence BlueShield; (b) any affiliate of defendants; (c) predecessors or successors in interest of any of the foregoing; and (d) all subsidiaries or parent entities of any of the foregoing acting as a health carrier in the State of Washington; and

(2) The term "qualified mental health condition" shall mean a condition listed in the most recent edition of the Diagnostic and Statistical Manual (DSM) published by the American Psychiatric Association other than (a) substance related disorders and (b) life transition problems, currently referred to as "V" codes, and diagnostic codes 302 through 302.9 as found in the DSM, where the service received, required, or expected to be required is not properly classified as skilled nursing facility services, home health care, residential treatment, custodial care or non-medically necessary court-ordered treatment.

Dkt. # 20 at 8.

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 133 S.

---

[20] Although the Ninth Circuit has noted that the "better procedure" may be to defer ruling on a class certification motion where a State Supreme Court is considering the same legal issue (*Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1023 n.6 (9th Cir. 2003)), given the nature of the hardship, the urgency with which children in the putative class need coverage, and defendants' policy and firm commitment to continue denying coverage for medically necessary neurodevelopmental therapies for children with mental health conditions over the age of six based on the age exclusion, the court does not believe it would be prudent to await such a decision.

1    Ct. 1426, 1432 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).

2    Thus, the court must perform a rigorous analysis that the prerequisites of Rule 23(a) have

3    been satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  As part of

4    this analysis, the court "*must* consider the merits [of the substantive claims] if they

5    overlap with the Rule 23(a) requirements."[21]  *Ellis v. Costco Wholesale Corp.*, 657 F.3d

6    970, 981 (9th Cir. 2011) (emphasis in original); *see also Comcast*, 133 S. Ct. at 1432.

7            A plaintiff seeking class certification has the burden of demonstrating that each of

8    the elements of Rule 23(a) are present: "(1) the class is so numerous that joinder of all

9    members is impracticable; (2) there are questions of law or fact common to the class; (3)

10   the claims or defenses of the representative parties are typical of the claims or defenses of

11   the class; and (4) the representative parties will fairly and adequately protect the interests

12   of the class." Fed. R. Civ. P. 23(a); *Ellis*, 657 F.3d at 979–80.  Once the plaintiff has

13   demonstrated that each of these elements is present, he must then prove that at least one

14   of the three prongs of Rule 23(b) is satisfied. Fed. R. Civ. P. 23(b); *Ellis*, 657 F.3d at

15   979–80.

16           1.   Numerosity

17           Numerosity is satisfied where joinder would be impracticable. *Smith v. Univ. of

18   Wash. Law Sch.*, 2 F. Supp. 2d 1324, 1340 (W.D. Wash. 1998) (citing *Harris v. Palm

19   Spring Alpine Estates, Inc.*, 329 F.2d 909, 913 (9th Cir. 1964).

20           Defendants do not challenge numerosity.  Plaintiffs' proposed subclass is

21   projected to number in the tens of thousands. Dkt. # 9-6 at 41-42 (Ex. S to Hamburger

22   Decl., Fox Decl. ¶ 9).  Accordingly, numerosity is met.

23           2.   Commonality

24           To meet the commonality requirement, a plaintiff must demonstrate that "there are

25   questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The Supreme

26   ───────────────

27       [21] The court incorporates by reference its analysis above regarding the merits of
     plaintiffs' claims.

1    Court has explained that this requirement is better understood as an inquiry into the

2    capacity of a classwide proceeding to generate common *answers* apt to drive the

3    resolution of the litigation. *Wal-Mart*, 131 S. Ct. at 2551.  Commonality only requires a

4    single significant question of law or fact.  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d

5    581, 589 (9th Cir. 2012).

6         Plaintiffs identify the following, significant common question:  Does Regence's

7    exclusion of neurodevelopmental therapies for the treatment of DSM mental conditions

8    for its insureds over the age of six violate the Washington Mental Health Parity Act?

9    Dkt. ## 20 at 11; 28 at 7.  The court agrees that resolution of this significant common

10   question will resolve several issues that are central to the validity of each claim in one

11   stroke:  (1) whether Regence wrongfully denied benefits and misinformed its insureds

12   under the ERISA plans it insures, (2) whether Regence breached its fiduciary duties

13   under ERISA, and (3) whether declaratory and injunctive relief is appropriate.

14        Defendants' arguments against commonality regarding the individualized issues

15   raised go to preponderance under Rule 23(b)(3), not whether there are common issues

16   under Rule 23(a)(2).  *See Mazza*, 666 F.3d at 589 ("Even assuming arguendo that we

17   were to agree with Honda's 'crucial question' contention, the individualized issues raised

18   go to preponderance under Rule 23(b)(3), not to whether there are common issues under

19   Rule 23(a)(2).").

20        Defendants also cite *Mazza* for the proposition that no class may be certified that

21   contains members lacking Article III standing.  Dkt. # 23 at 7.   However, defendants fail

22   to cite Ninth Circuit and Supreme Court precedent that explicitly contradicts the rule they

23   tout.

24        The Ninth Circuit has not provided clear guidance regarding whether all class

25   members, or only one named plaintiff, must satisfy Article III standing.  *Compare*

26

27

AMENDED ORDER - 22

1   *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011)[22] *with Mazza*, 666

2   F.3d at 594.  In *Casey v. Lewis*, 4 F.3d 1516, 1519 (9th Cir. 1993), the Ninth Circuit

3   declared that "[a]t least one *named* plaintiff must satisfy the actual injury component of

4   standing in order to seek relief on behalf of himself or the class."  *Accord Ellis v. Costco*

5   *Wholesale Corp.*, 657 F.3d 970, 979 (9th Cir. 2011) ("Because only one named Plaintiff

6   must meet the standing requirements, the district court did not err in finding that

7   Plaintiffs have standing.").  In 2007, sitting en banc, the Ninth Circuit held that "[i]n a

8   class action, standing is satisfied if at least one named plaintiff meets the requirements."

9   *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc).  This

10  holding is consistent with Supreme Court precedent that plaintiffs "must allege and show

11  that they personally have been injured, not that injury has been suffered by other,

12  unidentified members of the class to which they belong and which they purport to

13  represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975); *see also Lewis v. Casey*, 518 U.S.

14  343, 395 (1996) (Souter, J., concurring) (class certification "does not require a

15  demonstration that some or all of the unnamed class could themselves satisfy the standing

16  requirements for named plaintiffs.").

17       Nevertheless, in *Mazza*, the Ninth Circuit announced a contradictory rule, quoting

18  the Second Circuit, without explanation, that "'[n]o class may be certified that contains

19  members lacking Article III standing.'"  *Mazza*, 666 F.3d at 594 (quoting *Denney v.*

20  *Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)).[23]  However, a three judge panel

21

22       [22] The court notes that *Stearns* has been cited for both sides of this issue.  This is likely because the *Stearns* court noted that "[e]ach alleged class member was relieved of money in the

23  transactions" in concluding that the injury is both concrete and particularized.  655 F.3d at 1021. However, the *Stearns* court also quoted relevant Ninth Circuit authority and held that the actual

24  injury component of Article III standing "keys on the representative party, not all of the class members." *Id.*

25       [23] District courts in the Ninth Circuit have not reached a consensus on whether absent class members must demonstrate Article III standing.  *See Waller v. Hewlett-Packard Co.*, __

26  F.R.D. __, Case No. C11-454-LAB (RBB), 2013 WL 5551642, *4-7 (S.D. Cal. Sept. 29, 2013) (summarizing numerous district court decisions in the Ninth Circuit).  This District also has not

27  taken a unified approach to this issue.  Although decided pre-*Mazza* and post-*Stearns*, the

1   cannot overrule prior Ninth Circuit precedent—let alone an en banc decision—unless the

2   reasoning or theory of prior circuit authority is clearly irreconcilable with the reasoning

3   or theory of intervening higher authority.  *Pinto v. Holder*, 648 F.3d 976, 982 (9th Cir.

4   2011).  The court also believes that *Mazza* was determined based on the unique

5   circumstances of California's unfair competition law that requires plaintiffs to

6   demonstrate reliance as to absent class members.  *Mazza*, 666 F.3d at 595-96.

7          Accordingly, the court declines to follow the rule cited in *Mazza*, and instead

8   follows prior Ninth Circuit and Supreme Court precedent that the Article III standing

9   inquiry is only applicable to the named plaintiff, not putative class members.  *Stearns*,

10  655 F.3d at 1021; *Ellis*, 657 F.3d at 979; *Bates*, 511 F.3d at 985; *Warth*, 422 U.S. at 502.

11         3.   Typicality

12         The typicality requirement of Rule 23(a) ensures that the interests of the named

13  plaintiff align with those of the class.  Fed. R. Civ. P. 23(a)(3); *Hanon v. Dataproducts*

14  *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  To determine whether the named plaintiff's

15  claims are typical, the court analyzes "whether other members have the same or similar

16  injury, whether the action is based on conduct which is not unique to the named

17  plaintiffs, and whether other class members have been injured by the same course of

18  conduct."  *Hanon*, 976 F.2d at 508.  If a class representative's claims are subject to

19  unique defenses that threaten to attract the focus of the litigation, class certification is

20  inappropriate.  *Id.*

21

22

---

23  Honorable Marsha J. Pechman relied on the Supreme Court's *Warth* holding that Article III
    standing requires that the plaintiffs, and not unidentified class members, have been personally
24  injured.  *In re Wash. Mut. Mortgage-Backed Sec. Lit.*, 276 F.R.D. 658, 664 (W.D.Wash. 2011).
    In contrast, in a post-*Mazza* decision, the Honorable James L. Robart held that the court may not
25  certify a proposed class containing members who cannot establish Article III standing.  *Bunch*,
    Case No. C12-1238JLR, 2013 WL 6632025 at *5.  In another post-*Mazza* case, the Honorable
26  John C. Coughenour recognized the conflicting Ninth Circuit authority, and determined it need
    not reach this issue since every putative class member had Article III standing.  *Agne v. Papa*
27  *John's Int'l, Inc.*, 286 F.R.D. 559, 565 (W.D. Wash. 2012).

1    Defendants argue that B.S.'s claims are not typical because (1)

2  neurodevelopmental therapy is not medically necessary or currently indicated for him, (2)

3  the therapy was not provided to treat a DSM condition, and (3) he did not exhaust his

4  administrative remedies.  Dkt. # 23 at 14.  The court has already considered and rejected

5  the first two arguments above.[24]

6    "A beneficiary seeking a determination of rights or benefits under a plan must first

7  exhaust the administrative remedies provided by the plan."  *Horan v. Koch*, 947 F.2d

8  1412, 1416 (9th Cir. 1991) (overruled on other grounds).  "A district court has discretion

9  to waive the exhaustion requirement . . . and should do so when exhaustion would be

10  futile."  *Id.*

11    Defendants have consistently and routinely interpreted their policies to deny

12  coverage for neurodevelopmental therapy for children with mental health conditions age

13  seven and older based on the age exclusion.  Under these circumstances, exhaustion

14  would be futile.  The court therefore exercises its discretion and waives exhaustion for

15  B.S. and putative class members.

16

17

18    [24] The court notes, again, that the court previously rejected the first two arguments.
    Additionally, defendants have consistently denied coverage based solely on the age exclusion,
19  not medical necessity or any other reason that would require individualized determinations of the
    class claims.  Indeed, at the time that Regence made its coverage decision for B.S., the medical
20  evidence before it indicated that the therapies were medically necessary to treat his autism, and
    Regence denied coverage for neurodevelopmental therapy based solely on the age exclusion.
21  Dkt. ## 6-2 at 5-7 (Ex. B to E.S. Decl., Araujo Eval.); 6-4 at 2-4 (Ex. D to E.S. Decl., Long
    Eval.); 6-5 at 2 (Ex. E to E.S. Decl., Wagner Letter); 6-6 at 3 (Ex. F to E.S. Decl., Denial of
22  Coverage Letter); s*ee also* Dkt. # 6-1 at 18-19 (Ex. A to E.S. Decl., Policy at 11) ("Mental
    Health Services means Medically Necessary outpatient services . . . ."); WAC 284-30-380(1)
23  (requiring insurers to specify the grounds for denying a claim).  The court expresses no opinion
    at this time regarding whether Regence should be estopped from asserting defenses other than
24  the age exclusion since neither party has provided briefing on this issue.  *See Hayden v. Mut. of
    Enumclaw Ins. Co.*, 141 Wash. 2d 55, 63, 1 P.3d 1167 (Wash. 2000) (under traditional forms of
25  estoppel available in insurance cases, insureds must demonstrate that they either suffered
    prejudice or the insurer acted in bad faith when it failed to raise all its grounds for denial in its
26  initial denial letter).

27

1    Accordingly, the court finds that B.S. is not subject to unique defenses identified

2    by defendant, and finds that his claims are typical of the claims of the proposed class.

3           4.   <u>Adequacy of Representation</u>

4    The adequacy requirement under Rule 23(a) has two components: (1) whether any

5    conflicts of interests exist between plaintiffs and their counsel and other class members,

6    and (2) whether plaintiffs and their counsel will vigorously prosecute the action on behalf

7    of the class members.  Fed. R. Civ. P. 23(a)(4); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

8    1020 (9th Cir. 1998).

9    Defendants argue that B.S. is not an adequate representative because of the alleged

10   unique defenses.  Dkt. # 23 at 15.  The court has already rejected these arguments above.

11   Defendants have not identified any conflicts of interest between B.S. and counsel and

12   other class members, and the court finds none.  Additionally, B.S.'s father is familiar

13   with the duties and responsibilities of being a class represented, and will diligently look

14   out for the interests of all class members.  Dkt. # 6 (E.S. Decl.) ¶ 14.

15   The court finds that B.S. is an adequate representative for the subclass identified

16   above.

17          5.   <u>Rule 23(b)</u>

18   Having concluded that all the Rule 23(a) factors are present, B.S. must now prove

19   that at least one of the three prongs of Rule 23(b) is satisfied.  Fed. R. Civ. P. 23(b);

20   *Comcast*, 133 S. Ct. at 1432.  Plaintiffs argue that certification is appropriate for the

21   neurodevelopmental therapy age exclusion subclass under Rule 23(b)(1) and (2) for the

22   following claims:

23        •   Under ERISA § 502(a)(1)(B), to "enforce his rights under the terms

24          of the plan, [and] to clarify his rights to future benefits under the
       terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

25        •   Under ERISA § 502(a)(2), to seek "appropriate relief" under ERISA

26          § 409(a), which permits "equitable or remedial relief as the court
       may deem appropriate . . . ."  29 U.S.C. § 1132(a)(2); 29 U.S.C. §

27          1109(a).

- Under ERISA § 502(a)(3), to seek non-monetary relief "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter of the terms of the plan." 29 U.S.C. § 1132(a)(3).

Dkt. # 20 at 15.

Under Rule 23(b)(1), class action is appropriate if prosecuting separate actions by individual class members would create a risk of inconsistent results that would establish incompatible standards of conduct for the party opposing the class, or adjudications with respect to individual class members would be dispositive of, or substantially impair, the interests of the other putative class members not parties to the adjudication. Fed. R. Civ. Proc. 23(b)(1).

Defendants again argue that individualized issues unique to each plaintiff preclude certification. Dkt. # 23 at 16. The court disagrees. The issue confronting every putative class member is whether defendants may deny coverage for neurodevelopmental therapy for mental health conditions based on the age exclusion. "As a fiduciary, [Regence] is bound to follow the terms of the Plan." *Z.D. v. Group Health Co-op.*, Case No C11-1119RSL, 2012 WL 1977962, *7 (W.D. Wash. June 1, 2012) (citing 29 U.S.C. § 1104(a)(1)(D)). "Moreover, ERISA requires that, 'where appropriate,' plan provisions must be 'applied consistently with respect to similarly situated claimants.'" *Id.* (citing C.F.R. § 2560.503-1(b)(5)). "Thus, were this Court to find that the Plan requires Defendants to act in a certain fashion, ERISA would require [Regence] to act in a similar fashion toward all beneficiaries—the quintessential (b)(1)(B) scenario." *Id.* "[I]f another court were to interpret the Plan differently, it would trap Defendants 'in the inescapable legal quagmire of not being able to comply with one such judgment without violating the terms of another,'" which is what (b)(1)(A) was enacted to remedy. *Id.*

1    The court finds that the subclass is certifiable under Rule 23(b)(1).[25]

2    ### VI. CONCLUSION

3    For all of the foregoing reasons, the court GRANTS plaintiffs' motions for

4    preliminary injunction and class certification.

5    ### VII. PRELIMINARY INJUNCTION

6    For the reasons stated above, the court enters the following preliminary injunction.

7    For the pendency of this litigation, defendants shall not deny coverage for B.S.'s, or any

8    putative class member's, requests for neurodevelopmental therapy benefits to treat a

9    mental health condition based on the age exclusion.

10   Additionally, defendants do not object to plaintiffs' argument that no bond should

11   be required (*see* Dkt. # 26), and the court uses its discretion to dispense with the security

12   requirement here.  *See Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766

13   F.2d 1319, 1325 (9th Cir. 1985) ("The court has discretion to dispense with the security

14   requirement, or to request mere nominal security, where requiring security would

15   effectively deny access to judicial review.").

16   ### VIII. CLASS CERTIFICATION

17   The court certifies the following class for the purpose of seeking declaratory and

18   injunctive relief under ERISA §§ 502(a)(1)(B), (a)(2), and (a)(3):

19    All individuals who:

20   (1) are, or will be, beneficiaries under an ERISA-governed health plan that
     has been or will be delivered, issued for delivery, or renewed on or after
     January 1, 2006, by Regence; and (2) require neurodevelopmental therapy

---

23   [25] Alternatively, the court also finds that the subclass is certifiable under Rule 23(b)(2)

24   where the court need only determine the requirements of Washington law as applied to the plan
     as a whole.  Rule 23(b)(2) allows certification if the party opposing the class has acted or refused

25   to act on grounds that apply generally to the class so that final injunctive relief or corresponding
     declaratory relief is appropriate respecting the class as a whole.  Here, the injunction will

26   prohibit defendants' policy and practice of denying neurodevelopmental therapy coverage to
     treat mental health conditions based on the age exclusion.  Class certification under 23(b)(2) is

27   therefore appropriate.

for the treatment of a qualified mental health condition.

**Definitions:**

(1) The term "Regence" shall mean (a) Regence BlueShield; (b) any affiliate of defendants; (c) predecessors or successors in interest of any of the foregoing; and (d) all subsidiaries or parent entities of any of the foregoing acting as a health carrier in the State of Washington; and

(2) The term "qualified mental health condition" shall mean a condition listed in the most recent edition of the Diagnostic and Statistical Manual (DSM) published by the American Psychiatric Association other than (a) substance related disorders and (b) life transition problems, currently referred to as "V" codes, and diagnostic codes 302 through 302.9 as found in the DSM, where the service received, required, or expected to be required is not properly classified as skilled nursing facility services, home health care, residential treatment, custodial care or non-medically necessary court-ordered treatment.

The court appoints the law firm Sirianni Youtz Spoonemore, and attorneys Richard Spoonemore and Eleanor Hamburger, as class counsel, and names B.S., by and through his guardians, as class representative.

The parties shall meet and confer regarding the notice to be provided pursuant to Rule 23(c)(2) within seven days of this order, and file a joint document proposing the form of notice to be given to putative class members within ten days of this order along with a proposed order approving the form of notice.[26]

Dated this 27th day of February, 2014.

_Richard A. Jones_

The Honorable Richard A. Jones
United States District Judge

---

[26] The parties have already complied with this directive in response to the January 24, 2014 order.

AMENDED ORDER - 29